IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

SHAWN REVOLT,              )      CASE NO.  3:17-cv-02167
                              )
          Plaintiff,     )      MAGISTRATE JUDGE
                              )      KATHLEEN B. BURKE
       v.              )
                              )
COMMISSIONER OF SOCIAL   )
SECURITY,                )
                              )      **MEMORANDUM OPINION & ORDER**
          Defendant.    )

Plaintiff Shawn Revolt ("Plaintiff" or "Revolt") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying his applications for social security disability benefits.  Doc. 3.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 17.

For the reasons explained herein, the Court **AFFIRMS** the Commissioner's decision.

## I.  Procedural History

On March 11, 2014, Revolt protectively filed an application for disability insurance benefits ("DIB") and, on March 17, 2014, Revolt protectively filed an application for supplemental security income ("SSI").[1]  Tr. 15, 103, 104, 181-187.  Revolt alleged a disability onset date of September 1, 2012.[2]  Tr. 15, 64, 194.   He alleged disability due to heart problems (three heart attacks and five stents), collapsed lung, depression, neck pain, fatigue, numbness in

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 10/15/2018)

[2] The alleged onset date was amended from June 11, 2008, to September 1, 2012.  Tr. 64, 194.

feet and arms, shortness of breath, mood swings, sexual dysfunction, and anti-social behavior. Tr. 79-80, 105, 138, 154, 200.

After initial denial by the state agency (Tr. 138-151) and denial upon reconsideration (Tr. 154-165), Revolt requested a hearing (Tr. 166-167). A hearing was held before Administrative Law Judge Timothy J. Keller ("ALJ") on June 23, 2016. Tr. 51-78. On August 8, 2016, the ALJ issued an unfavorable decision (Tr. 12-28), finding that Revolt had not been under a disability within the meaning of the Social Security Act from September 1, 2012, through the date of the decision (Tr. 15, 23). Revolt requested review of the ALJ's decision by the Appeals Council. Tr. 179-180. On August 15, 2017, the Appeals Council denied Revolt's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 5-10.

## II. Evidence

### A. Personal, vocational and educational evidence

Revolt was born in 1969. Tr. 181. He completed school through the ninth grade and dropped out of school in the tenth grade. Tr. 55, 56, 201. Revolt has difficulty with reading, writing, and performing basic math. Tr. 57-60. Revolt last worked in 2008 as a foam molder laborer. Tr. 74-75, 200, 201.

### B. Medical evidence

#### 1. Treatment history

Revolt has a history of cardiac issues predating his alleged onset date. He reported suffering a heart attack in 2002, which necessitated three stents. Tr. 254. Revolt had a second heart attack approximately five or six years later, which required another stent. Tr. 254. On September 13, 2011, Revolt had a stress test and followed up with his cardiologist Dr. Zoheir Abdelbaki, M.D. Tr. 425-431. Dr. Abdelbaki noted Revolt's history of coronary artery disease

(CAD) and hyperlipidemia. Tr. 429. Revolt continued to smoke; he felt tired; he had only minor episodes of chest pains; his breathing was fair; and he indicated that he was not having as many issues with compliance as he had in the past. Tr. 429. On examination, Dr. Abdelbaki observed that Revolt's lungs were clear to auscultation and there was a slight murmur noted in the heart but no rubs or gallops. Tr. 430. Dr. Abdelbaki noted that Revolt was a high risk patient but his CAD seemed to be stable. Tr. 430. Dr. Abdelbaki discussed the importance of smoking cessation especially in light of Revolt's CAD. Tr. 430. Dr. Abdelbaki recommended that Revolt continue with his aggressive prescriptions and to report to the emergency room if he had recurrent symptoms. Tr. 430.

On March 13, 2012, Revolt saw Dr. Abdelbaki for complaints of chest pain. Tr. 432-441. Revolt reported chest pain, a pressure sensation when taking his nitroglycerin, and dyspnea. Tr. 436. Revolt was still smoking. Tr. 436. On examination, Revolt's lungs were clear to auscultation and there was a slight murmur in his heart but no rubs or gallops. Tr. 437. Dr. Abdelbaki's assessment was that Revolt's CAD symptoms had been worsening. Tr. 437. Revolt's hypertension seemed to be under good control. Tr. 437. Dr. Abdelbaki discussed with Revolt the importance of smoking cessation. Tr. 437. An ECG (electrocardiogram) was performed in the office that day and Dr. Abdelbaki noted that there were no acute findings. Tr. 437. Dr. Abdelbaki recommended a stress test and that Revolt continue with risk factor modification and medical management of his conditions. Tr. 437. A stress test was performed on March 23, 2012. Tr. 442-443. The stress test showed mild ischemia. Tr. 443. Dr. Abdelbaki recommended that Revolt undergo a cardiac catheterization to evaluate the coronary anatomy but noted that Revolt had not been the most compliant with medical therapy and continued to smoke.

Tr. 442. Dr. Abdelbaki observed that Revolt was a high risk patient with a poor prognosis. Tr. 442.

In April 2012, Revolt had open heart surgery. Tr. 260. Following his surgery, Revolt saw his primary care physician Dr. Anuradha Rameneni, M.D., on May 2, 2012. Tr. 260-271. Revolt followed up with Dr. Rameneni on May 4, 2012, for a wound check and dressing change. Tr. Tr. 272-280. Revolt reported no chest pain or cough and his dyspnea was improving. Tr. 277. He did report a mild sore throat and ear pain for the prior two days. Tr. 277. Upon examination of Revolt's chest, Dr. Rameneni noted bilateral crackles at the base which had improved from the prior visit. Tr. 277. Revolt's chest wounds were healing. Tr. 277. Revolt was alert and oriented to person, place and time. Tr. 277. He had a normal mood and affect, his behavior was normal, and his thought content was normal. Tr. 277.

When Revolt saw Dr. Rameneni on June 14, 2012, he relayed that his surgical scars sometimes felt tight; he had no chest pain, dyspnea or leg swelling; and he was not feeling anxious or depressed. Tr. 603. Also, although he knew the dangers associated with smoking due to all of his cardiac problems, he was unable to control the urges and started smoking again. Tr. 603. On cardiovascular examination, Dr. Rameneni observed a normal rate, regular rhythm, and normal heart sounds and heard no murmur. Tr. 603. On examination of Revolt's pulmonary/chest, Revolt's effort was normal, he had no wheezes, and he exhibited no tenderness. Tr. 603. Revolt had a normal mood and affect; his behavior was normal; and his thought content was normal. Tr. 603. Dr. Rameneni provided Revolt with a prescription for nicoderm patches. Tr. 603-604.

Revolt saw Dr. Rameneni on July 26, 2012. Tr. 287-292. Revolt did not finish his cardiac rehab. Tr. 287. He reported no chest pains but reported getting fatigued and having

shortness of breath even with walking a little. Tr. 287. Revolt was feeling depressed, having

lost his brother the prior month. Tr. 287. He was having some right ear pain. Tr. 287. On

examination, Revolt had some tenderness in the right TMJ joint. Tr. 287. Cardiovascular

examination revealed normal rate, regular rhythm and normal heart sounds and no murmur. Tr.

287. Pulmonary/chest examination showed normal effort. Tr. 287. Revolt did not have edema.

Tr. 287. Revolt's mood and affect were normal; his behavior was normal; and his thought

content was normal. Tr. 287. Dr. Rameneni discussed smoking cessation with Revolt. Tr. 288.

Revolt was advised to use warm and cold compresses on the TMJ and to see a dentist if it did not

get better. Tr. 288.

Revolt saw Dr. Rameneni on October 29, 2012, with complaints that his upper chest

continued to hurt and he was easily fatigued. Tr. 298-305. Revolt also requested that Dr.

Rameneni complete disability paperwork. Tr. 299. Revolt indicated he really could not work

anywhere because he was fatigued even after 15-20 minutes of work. Tr. 299. Revolt also

relayed that he could not sit or stand in place for more than 10-15 minutes. Tr. 299. His chest

always felt tight at the sight of the incision. Tr. 299. Revolt had dyspnea after walking 7-9

blocks. Tr. 299. Revolt indicated he was unable to work in a group because of his moods. Tr.

299. Cardiovascular examination revealed normal rate, regular rhythm and normal heart sounds;

no murmur was heard. Tr. 299. Pulmonary/chest examination showed normal effort and no

wheezes but Revolt had some chest tenderness. Tr. 299. Revolt had no edema and he was alert

and oriented to person, place and time. Tr. 299.

On November 27, 2012, Revolt saw Dr. Abdelbaki and reported that he had been "doing

fair[.]" Tr. 244. Revolt was still smoking. Tr. 244. Revolt reported some dyspnea but no

wheezing and he denied recent chest pain. Tr. 245. On examination, Dr. Abdelbaki observed

that Revolt's lungs were clear to auscultation. Tr. 245. There was a slight murmur in Revolt's heart but no rubs or gallops. Tr. 245. Dr. Abdelbaki noted that Revolt was a very high risk patient with severe premature CAD. Tr. 245. However, Dr. Abdelbaki indicated that Revolt's CAD seemed to be stable and his hypertension seemed to be under good control with medical treatment. Tr. 245. Dr. Abdelbaki discussed with Revolt the importance of smoking cessation. Tr. 245. Dr. Abdelbaki advised Revolt to continue with risk factor modification and medical management. Tr. 246.

Revolt saw Dr. Rameneni on January 29, 2013, for follow up. Tr. 312-319. Revolt reported that he had been denied disability. Tr. 312. Revolt saw his cardiologist in November 2012. Tr. 312. Revolt had not stopped smoking. Tr. 312. He indicated that smoking relaxed him and he could not stop. Tr. 312. He reported having no chest pains but he was getting very tired and short of breath. Tr. 312. Revolt indicated that his back started hurting him the prior month and he was still anxious and depressed. Tr. 312. He was taking Celexa and did not think he needed to see a psychiatrist, noting that he knew all his problems. Tr. 312. Revolt's back and legs were very itchy and dry. Tr. 312. He relayed that he had gained some weight. Tr. 312. His blood pressure was well controlled. Tr. 312. On physical examination of the pulmonary/chest, Dr. Rameneni observed normal effort and no wheezes. Tr. 312. On musculoskeletal examination, Revolt revealed tenderness in his low back, pain on flexion/extension of his low back, negative straight leg raises, 5/5 strength, and no edema. Tr. 312. Dr. Rameneni observed that Revolt's behavior and thought content were normal but noted he was anxious and depressed. Tr. 313. Dr. Rameneni indicated that Revolt refused to see a counselor for his anxiety and was not ready to quit smoking. Tr. 313. Revolt agreed to try exercises for his back and physical therapy and he agreed to try to lose weight. Tr. 313.

Revolt saw Dr. Rameneni on March 7, 2013. Tr. 325-331. Revolt requested that Dr. Rameneni complete disability paperwork. Tr. 326. Revolt relayed that, since his heart surgery, he had various problems, including getting very tired after any amount of housework and being unable to function and needing to sit or lie down for an hour at times, getting very short of breath, and having numbness, tingling, and pain in his legs and back. Tr. 326. He had no chest pain or leg swelling and his blood pressure was well controlled. Tr. 326. Revolt relayed that he still had anxiety for which he was taking Xanax. Tr. 326. Revolt continued to report itching all the time. Tr. 326. Dr. Rameneni completed the disability paperwork. Tr. 327. Dr. Rameneni recommended that Revolt stop his over-the-counter medications one at a time to determine whether a certain medication was causing his itching. Tr. 327. Diagnostic testing was ordered as to Revolt's back and legs and lab work was recommended to check TSH (thyroid-stimulating hormone) and testosterone levels. Tr. 327. Dr. Rameneni noted that all other chronic conditions were stable and advised Revolt to continue on the current plan and medications. Tr. 327.

Revolt saw Dr. Rameneni on June 11, 2013, for follow up. Tr. 332-338-344. During the visit, Revolt relayed that he had an accident the prior week involving his left forearm. Tr. 332, 338-339. He was putting up a ceiling for a friend and some roofing material fell on his left forearm causing pain and swelling. Tr. 332, 339. He was "[a]ble to do all his work." Tr. 339. Revolt was still smoking. Tr. 339. He reported having no chest pain, dyspnea or leg swelling. Tr. 339. He was having a lot of anxiety. Tr. 339. He was having on and off pain in his lower back. Tr. 339. Dr. Rameneni noted that the last lumbar spine x-ray was normal. Tr. 339. Revolt indicated that he tried to do a lot of work but became tired. Tr. 339. Dr. Rameneni discussed lab work and the lumbar spine x-ray with Revolt, encouraged smoking cessation and

noted that all other chronic conditions were stable and Revolt should continue on his current plan and medications.  Tr. 340.

On September 3, 2013, Revolt saw Dr. Abdelbaki.  Tr. 451-457.  Dr. Abdelbaki noted that Revolt had multiple symptoms/conditions, including stomach issues, chest pain, back pain, coronary artery disease, dyspnea, fatigue, high blood pressure, and anxiety and depression.  Tr. 452.  Dr. Abdelbaki observed that Revolt was a very high risk patient who was still smoking and very non-compliant with medications.  Tr. 452, 453.  On examination, Dr. Abdelbaki noted a slight heart murmur but no rubs or gallops, no edema, lungs were clear to auscultation, and Revolt was alert and oriented.  Tr. 453.  Dr. Abdelbaki recommended consideration of a follow-up stress test since Revolt was very high risk.  Tr. 453.

Revolt saw Dr. Rameneni a few weeks later on September 19, 2013, for a routine follow up.  Tr. 345-357.  Revolt indicated that he was stressed all the time but he was not interested in medication for it.  Tr. 345, 351.  Revolt denied chest pain, dyspnea on exertion, leg swelling, and wheezing.  Tr. 351.  He had a dry cough.  Tr. 351.  He indicated that he tired easily.  Tr. 351.  Revolt continued to smoke and relayed that he had been eating a lot of fatty food.  Tr. 351.  With the exception of a rash on his elbows and some bruising on his forearms, the physical examination findings were unremarkable.  Tr. 352.  Dr. Rameneni encouraged smoking cessation but Revolt was not ready to quit.  Tr. 352.  Dr. Rameneni noted that Revolt's other chronic conditions were stable.  Tr. 353.

Revolt saw Dr. Rameneni on December 19, 2013.  Tr. 364-369.  Revolt relayed that he was under a lot of stress and had not been taking his medications regularly for the past month.  Tr. 365.  Revolt was still smoking.  Tr. 365.  He reported no chest pains and no wheezing but he felt tired.  Tr. 365.  His anxiety had been okay with Celexa but stress was causing him to be

depressed. Tr. 365. Physical examination findings were unremarkable. Tr. 365. Dr. Rameneni ordered a chest x-ray and pulmonary function testing. Tr. 366-367. March 28, 2014, pulmonary function testing showed minimal obstructive airway disease-peripheral and mild diffusion defect. Tr. 525-528.

Revolt saw Dr. Rameneni on April 23, 2014, (Tr. 377-384), reporting an upper respiratory infection for several days with a sore throat, ear ache, nasal congestion, and cough with wheezing (Tr. 377). He also reported having problems swallowing with gastroesophageal reflux disease. Tr. 377. Revolt had no recent chest pain or leg swelling but had chronic fatigue. Tr. 377. Dr. Rameneni continued to encourage smoking cessation. Tr. 379.

A few days later, Revolt saw Dr. Abdelbaki on April 29, 2014. Tr. 465-470. Revolt reported that he had stopped smoking for two weeks. Tr. 468. He reported no changes in his breathing but he was having atypical chest pain. Tr. 468. Dr. Abdelbaki noted a slight heart murmur but no rubs or gallops. Tr. 469. Other examination findings were unremarkable. Tr. 469. Dr. Abdelbaki indicated that Revolt's coronary artery disease seemed stable and his hypertension seemed to be under good control. Tr. 469. Dr. Abdelbaki continued to discuss the importance of smoking cessation and advised Revolt to continue with risk factor modification and medical management. Tr. 469.

Revolt saw gastroenterologist Dr. Richard R. Capone, M.D., on June 4, 2014, for his complaints of heartburn. Tr. 564-570. Revolt indicated that he was still smoking and reported drinking large amounts of Mountain Dew. TR. 564. Dr. Capone noted that Revolt had not gotten blood work or had an esophagram performed as ordered by Dr. Rameneni. Tr. 564. Dr. Capone ordered testing. Tr. 567-569.

On June 9, 2014, upon Dr. Rameneni's referral, Dr. Abdelbaki performed a stress test. Tr. 401-403. The stress test revealed a moderate amount of ischemia in the inferolateral region and the left ventricular systolic function was reduced, with regional wall motion abnormalities. Tr. 403. Clinical correlation was recommended. Tr. 403. On June 16, 2014, Revolt underwent a cardiac catheterization to evaluate the coronary anatomy. Tr. 414-415. Dr. Abdelbaki concluded that the catheterization showed very severe native vessel disease with small distal arteries; patent grafts; multiple branches coming off the mammary artery, which could be causing some angina and ischemia in that area; and normal left ventricular function. Tr. 415. Dr. Abdelbaki recommended aggressive medical therapy and risk factor modification. Tr. 415.

Following the catheterization, Revolt saw Dr. Abdelbaki on July 1, 2014. Tr. 471-482.[3] Revolt was smoking. Tr. 478. Physical examination findings were generally unremarkable. Tr. 480. Revolt had a slight murmur in his heart but no rubs or gallops. Tr. 479. Dr. Abdelbaki indicated that Revolt would have chronic symptoms of chest pain due to his underlying cardiac condition and, as a result, Revolt would be limited in multiple areas but, at that time, Revolt's cardiac condition was stable. Tr. 480. Dr. Abdelbaki recommended continued risk factor modification and medical management. Tr. 480.

Revolt saw Dr. Rameneni on January 29, 2015, for follow up regarding his chronic medical problems. Tr. 581-583. Dr. Rameneni noted that Revolt had missed appointments and did not complete his evaluation for his reported swallowing problems. Tr. 581. Revolt was taking medication for his GERD and gastritis which was helping. Tr. 581. Revolt reported no recent chest pain and no leg swelling. Tr. 581. Revolt felt tired. Tr. 581. Also, he was anxious and taking Celexa for it but he had run out of the medication and had not refilled it. Tr. 581. Dr.

---

[3] The July 1, 2014, treatment notes are also found at Tr. 511-524 in the transcript.

Rameneni encouraged smoking cessation but Revolt was not ready to quit. Tr. 581. Revolt felt that he was doing better with this throat problems and was not interested in proceeding with the barium swallow test. Tr. 582.

On March 3, 2015, Revolt saw Dr. Abdelbaki. Tr. 549-552. Revolt reported fatigue, tiredness, low energy, and no active angina. Tr. 549. Revolt had gained weight and was smoking. Tr. 549. Other than a slight heart murmur, physical examination findings were unremarkable. Tr. 550. Dr. Abdelbaki indicated that Revolt's CAD seemed stable; Revolt denied angina or a change in his breathing pattern; and Revolt's hypertension seemed to be under good control. Tr. 550. Dr. Abdelbaki discussed the importance of smoking cessation especially with CAD and noted that COPD was likely. Tr. 550. Dr. Abdelbaki recommended risk factor modification and medical management. Tr. 550. Dr. Abdelbaki also recommended a pulmonary function test but Revolt did not want a lung examination at that time. Tr. 550.

On January 19, 2016, Revolt saw Dr. Abdelbaki. Tr. 561-563. Revolt reported that he was doing "fair." Tr. 561. He was under some stress and had gained some weight. Tr. 561. He indicated he had some hot flash episodes. Tr. 561. There had been no changes in his breathing. Tr. 561. He was still smoking. Tr. 561. Other than a slight heart murmur, physical examination findings were unremarkable. Tr. 562. Dr. Abdelbaki indicated that Revolt's CAD seemed stable; Revolt denied angina or a change in his breathing pattern; and Revolt's hypertension seemed to be under good control. Tr. 562. Dr. Abdelbaki discussed the importance of smoking cessation especially with CAD. Tr. 562. Dr. Abdelbaki had a discussion with Revolt about obesity and diet and weight control. Tr. 562. Dr. Abdelbaki reminded Revolt to take his beta blockers and he recommended risk factor modification and medical management. Tr. 562.

The following day, January 20, 2016, Revolt saw Dr. Gregory Benedict Parranto, M.D., for follow up regarding his chronic medical conditions. Tr. 578-580. Dr. Parranto noted that Revolt had seen Dr. Rameneni in the past. Tr. 578. Revolt complained of being lethargic and unable to do his normal amount of work and informed Dr. Parranto that he had applied for disability several times without success. Tr. 578. Revolt wanted to discuss his prescriptions and needed refills. Tr. 579. Revolt was interested in quitting smoking and wanted to try Chantix. Tr. 579. On examination, Dr. Parranto noted that Revolt was in no distress but appeared anxious. Tr. 579. His chest was clear to auscultations and there were no wheezes, rales or rhonchi. Tr. 579. Dr. Parranto noted that Revolt had a dry cough during the examination caused by deep inhalation. Tr. 579. Revolt's heart rate was normal with a regular rhythm and there were no murmurs, rubs, clicks or gallops. Tr. 579. There was no joint tenderness, deformity or swelling and peripheral pulses were normal and there was no pedal edema. Tr. 579. Dr. Parranto prescribed Chantix. Tr. 580.

2. **Opinion evidence**

   a. **Treating source**

On March 7, 2013, Dr. Rameneni completed a Medical Statement Regarding Physical Abilities and Limitations. Tr. 250-251. Dr. Rameneni opined that Revolt could work no hours per day; sit at one time for 15 minutes; stand at one time for 15 minutes; lift 5 pounds on a "rare" basis, i.e., 1% - 5% of an 8-hour workday; lift 5 pounds on an "occasional" basis, i.e., 6% - 33% of an 8-hour workday; lift no weight on a "frequent" basis, i.e., 34% - 66% of an 8-hour workday; never bend, stoop, or balance; occasionally perform fine and gross manipulation;[4] never work around dangerous equipment; occasionally/frequently operate a motor vehicle; and

---

[4] With respect to gross manipulation with the right hand, Dr. Rameneni circled both occasionally and frequently. Tr. 250.

unable to tolerate exposure to cold.  Tr. 250.  Dr. Rameneni indicated that Revolt had limited "close vision."  Tr. 251.  Dr. Rameneni opined that Revolt suffered from moderate pain.[5]  Tr. 251.  Dr. Rameneni opined that Revolt would need to take unscheduled breaks during the workday every 15 minutes for 5-10 minutes due to chronic fatigue and back pain.  Tr. 251.  Dr. Rameneni opined that Revolt's symptoms would cause him to be off task for even simple work tasks 25% or more of the time.  Tr. 251.  Dr. Rameneni commented that Revolt suffered from severe CAD with several stents, chronic fatigue, and anxiety.  Tr. 251.

### b. Consultative examining psychologist

On April 17, 2014, consultative examining psychologist Michael J. Wuebker, Ph.D., conducted a psychological evaluation.  Tr. 252-257.  Dr. Wuebker considered a prior psychological evaluation that he completed on July 23, 2012.  Tr. 252.  Revolt relayed that his disability application was his sixth application and he was seeking disability because of "[his] heart – [his] blood."  Tr. 252.  Revolt reported being married for a short time between 1990 and 1992.  Tr. 253.  He had one child from his marriage.  Tr. 253.  Revolt also had a child from a prior relationship whom Revolt had custody of.  Tr. 253, 256.  That child, a fourteen-year old son, was incarcerated at the time of the evaluation.  Tr. 256.

Revolt relayed that he had a ninth grade education.  Tr. 253.  Revolt attempted the GED twice without success.  Tr. 253.  Revolt described himself as being a good worker when he was employed, indicating that his attendance was not a problem and he related adequately with coworkers and supervisors but preferred to work alone.  Tr. 253.  He usually was able to handle work stress by keeping things to himself if they bothered him.  Tr. 253.  There were two occasions where he got angry at someone and threw a cell phone and pop bottle on the ground.

---

[5] The available rating choices were mild, moderate, severe, or extreme.  Tr. 251.

Tr. 253.  Since he was last employed in 2008, Revolt had applied for work but had not gotten a job.  Tr. 253-254.

Revolt indicated he was healthy until he had a heart attack in 2002, which required three stents.  Tr. 254.   He suffered a subsequent heart attack a number of years later, which required another stent, and in 2012, he underwent quadruple bypass heart surgery.  Tr. 254.  Revolt relayed that he had dealt with depression.  Tr. 254.  For a brief period in 2006, Revolt participated in mental health counseling to work on a relationship.  Tr. 254.  He was taking citalopram and felt it helped some.  Tr. 254.  Revolt denied having any problems with anxiety for a while.  Tr. 255.

Revolt explained that he spent time during the day watching television, playing videogames, texting with friends, and napping.  Tr. 256.  Revolt occasionally visited friends and visited with his family twice a week.  Tr. 256.  Revolt indicated that he interacted with his dog; he was able to cook; and he performed light cleaning tasks, noting that he got tired fast.  Tr. 256. Revolt was able to shop.  Tr. 256.  He was not involved in any structured social activities.  Tr. 256.

Dr. Wuebker diagnosed Other Specified Depressive Disorder – Recurrent brief depression.  Tr. 256.  Dr. Wuebker found that Revolt seemed to be functioning in the low average range of intelligence and opined that Revolt would be expected to understand and apply instructions consistent with that intellectual functioning.  Tr. 256.  Dr. Wuebker opined that Revolt maintained the flow of conversation during the interview; his attention was sufficient for questions to be answered; he demonstrated a freedom from distractibility and indicated he had no problem with attention, concentration, persistence or pace when he was working.  Tr. 257.  Dr. Wuebker opined that Revolt exhibited no attitudes or behaviors that would indicate problems

getting along with coworkers or supervisors.  Tr. 257.  Dr. Wuebker opined that Revolt would be mentally and emotionally capable of responding appropriately to work setting pressures.  Tr. 257.

### c. Reviewing physicians/psychologists

*Physical*

On May 17, 2014, state agency reviewing physician Bruce Mirvis, M.D., completed a physical RFC assessment.  Tr. 86-87.  Dr. Mirvis opined that Revolt had the RFC to occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; stand and/or walk 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday and push and/or pull unlimitedly, other than as indicated for lift/carry.  Tr. 86.  Dr. Mirvis explained that the exertional limitations were based on Revolt's back pain and past "history of heart attacks fully recovered[.]"  Tr. 86.  Dr. Mirvis opined that Revolt would have the following postural limitations – frequently climbing ramps/stairs, stooping, kneeling, crouching and crawling and occasionally climbing ladders/ropes/scaffolds.  Tr. 86-87.  Dr. Mirvis opined that because of his reports of breathing problems, Revolt would have environmental limitations.  Tr. 87.  He would have to avoid concentrated exposures to extreme cold, extreme heat, wetness, humidity, and fumes, odors, dusts, gases, poor ventilation, etc.  Tr. 87.

Upon reconsideration, on September 11, 2014, state agency reviewing physician Gerald Klyop, M.D., completed a physical RFC assessment.  Tr. 112-113.  Dr. Klyop reached the same conclusions as Dr. Mirvis.  Tr. 86-87, 112-113.

*Mental*

On April 21, 2014, state agency reviewing psychologist Ermias Seleshi, M.D., reviewed the records and concluded that Revolt had only mild mental limitations and had no severe

psychological impairment.  Tr. 84-85.  Dr. Seleshi explained that there was no current mental health treatment, no indication of frequent exacerbations of symptoms, no hospitalizations, and no ambulatory, emergency or crisis visits.  Tr. 84.  Dr. Seleshi explained further that, "[w]hile [Revolt] may feel his depression is causing significant limitations in his functioning, objective findings do not support a severe psychological impairment presently."  Tr. 84.

Upon reconsideration, on September 24, 2014, state agency reviewing psychologist Bruce Goldsmith, Ph.D., reviewed the records and reached the same conclusion as Dr. Seleshi regarding Revolt's alleged mental impairment(s).  Tr. 110-111.

## C.    Testimonial evidence

### 1.    Plaintiff

Revolt was represented and testified at the hearing.  Tr.  55-74.  Revolt explained that he has trouble reading, writing and performing basic math.[6]  Tr. 57-58, 60, 62, 67-68.  He needed assistance with filling out forms throughout the social security disability application process.  Tr. 59.

Revolt explained that he has had three heart attacks, five stents, open heart surgery, four bypasses, and a collapsed lung.  Tr. 62.  Revolt experiences shortness of breath.  Tr. 69.  He estimated being able to safely lift and carry five or six pounds for a few minutes at a time.  Tr. 69.  Revolt has a difficult time bending and stooping because it causes pains in his lower back and cramps in his legs.  Tr. 69.  Revolt agreed with Dr. Remeneni's opinion that he would require unscheduled work breaks every 15 minutes for 5-10 minutes.  Tr. 69.  Revolt feels that he

---

[6] The ALJ questioned Revolt about his hearing testimony, including his testimony that he had problems with reading and writing, noting that Revolt had previously provided answers on forms completed during the application process that were inconsistent with his hearing testimony.  Tr. 58-59.

has some limitations on reaching with his arms on a repetitive basis, noting that when he reaches he gets a muscle cramp in his back.  Tr. 72.

As far as tasks around the house, Revolt can do the dishes, start the laundry, and sweep the floor.  Tr. 70.  He can perform those tasks for 20 minutes at most before needing to take a break.  Tr. 70.  Revolt noted that his ability to perform tasks depends on the day and how he feels.  Tr. 70.  Therefore, he was unable to say he could perform a particular task on a consistent basis.  Tr. 70.  Revolt has a driver's license and is able to drive.  Tr. 72.  However, he does not drive very far.  Tr. 72.  He drove himself to the hearing but had to stop twice during the 40-minute drive.  Tr. 72.

Revolt indicated that he has had anger issues and went to counseling a few times but did not think that the counseling was helping.  Tr. 62.  He indicated he is moody and depressed because of his medical problems.  Tr. 73.  Revolt misses working and wishes he was able to work.  Tr. 69, 73.

Since his open heart surgery, Revolt has experienced a dry cough.  Tr. 70.  He also has blurry vision at times and he is fatigued all the time.  Tr. 70-71.  He also gets numbness in his hands and legs which his doctors attribute to bad circulation/blood clots.  Tr. 71.  Because of the numbness, at times Revolt has problems holding on to things.  Tr. 71.  When he experiences numbness in his legs, he has to stand up or sit down to try to relieve the numbness.  Tr. 71.

Revolt was asked about a report indicating he injured his arm when roofing materials fell on his arm in June 2013.  Tr. 63, 64-65.  Revolt indicated that occurred while he was doing some work in his grandmother's basement.  Tr. 63, 66.  Revolt was not putting shingles on his grandmother's house.  Tr. 63-65.  There were some shingles on a table and some of them fell on

him.  Tr. 63. Revolt recalled that the incident may have occurred when he was assisting his grandmother after her basement flooded.  Tr. 66.

### 2.    Vocational expert

The Vocational Expert Brian Walmer ("VE") testified at the hearing.  Tr. 74-77.  The VE described Revolt's past work as a foam molder as a semi-skilled, medium exertional level job.[7] Tr. 75.  The ALJ asked the VE whether Revolt would be able to return to his prior employment if he was capable of lifting, carrying, pushing, and pulling 20 pounds occasionally and 10 pounds frequently and able to sit, stand and walk for 6 hours each out of an 8-hour workday with frequent climbing of ramps and stairs but only occasional climbing of ladders, ropes or scaffolds; only occasional stooping; frequent crouching and frequent kneeling; occasional crawling; and no concentrated exposure to extreme cold, extreme heat, wetness, dust, fumes or gases.  Tr. 75.  The VE indicated that Revolt would be unable to perform his past work.  Tr. 75.  However, there would be unskilled, light level work in the regional or national economy that Revolt could perform, including small parts assembler, inspector and hand packager, and assembly machine tender.  Tr. 75-76.  The VE provided regional and national job incidence data for the identified jobs.  Tr. 76.  If Revolt was only able to work less than one hour for an entire day and then be off task 25 percent of the time that he was at work, the VE indicated there would be no jobs available.  Tr. 76.  If Revolt was limited to lifting five pounds occasionally and no weight frequently, the VE indicated there would be no jobs available.  Tr. 77.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial

---

[7] The VE noted that, if Revolt lifted more than 50 pounds, he performed the job at a heavy exertional level.  Tr. 75.

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[8] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[9] claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the

---

[8] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A).

[9] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 404.1525.

national economy.

20 C.F.R. §§ 404.1520, 416.920;[10] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors

to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In his August 8, 2016, decision the ALJ made the following findings:[11]

1.  Revolt meets the insured status requirements of the Social Security Act through December 31, 2013. Tr. 17.

2.  Revolt has not engaged in substantial gainful activity since September 1, 2012, the alleged onset date. Tr. 17.

3.  Revolt has the following severe impairments: coronary artery disease and COPD. Tr. 17. Revolt's neck pain, depression, and all other impairments are non-severe. Tr. 17-19.

4.  Revolt does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. Tr. 19.

5.  Revolt has the RFC to perform light work except lift/carry 20 pounds occasionally and 10 pounds frequently; sit, stand and walk for 6 hours in an 8 hour workday; frequent climbing of ramps or stairs; occasional climbing of ladders, ropes or scaffolds; occasional stooping and crawling; frequent kneeling and crouching; and must avoid concentrated exposure to dust, fumes, gases, extreme cold, extreme heat and wetness. Tr. 19-22.

6.  Revolt is unable to perform any past relevant work. Tr. 22.

---

[10] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

[11] The ALJ's findings are summarized.

7.      Revolt was born in 1969 and was 43 years old, defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 222.

8.      Revolt has a limited education and is able to communicate in English.  Tr. 22.

9.      Transferability of job skills is not material to the determination of disability.  Tr. 22-23.

10.     Considering Revolt's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Revolt can perform, including small parts assembler, inspector and hand packager, and assembly machine tender.  Tr. 23.

Based on the foregoing, the ALJ determined Revolt had not been under a disability, as defined in the Social Security Act, from September 1, 2012, through the date of the decision.  Tr. 23-24.

## V. Plaintiff's Arguments

First, Revolt argues that the ALJ failed to properly evaluate the opinion of his treating physician Dr. Rameneni.  Doc. 13, pp. 5-9, Doc. 16, pp. 2-3.  Second, Revolt argues that the Appeals Council did not consider one of two evaluation reports prepared by consultative examining psychologist Dr. Wuebker, specifically Dr. Wuebker's July 23, 2012, evaluation report.  Doc. 13, pp. 9-11, Doc. 13-1, Doc. 13-2.  Third, Revolt argues that the ALJ failed to properly evaluate evidence regarding his mental health when reaching the conclusion that his depression was a non-severe impairment.  Doc. 13, pp. 11-13.

## VI. Law & Analysis

### A.      Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**B.     The ALJ did nor err in weighing Dr. Rameneni's opinion**

Revolt argues that the ALJ failed to properly evaluate the opinion of his treating physician Dr. Rameneni. Doc. 13, pp. 5-9, Doc. 16, pp. 2-3.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544. In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c). An ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions. *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. Mar. 16, 2011).

The ALJ discussed the opinion rendered by Dr. Remeneni and explained his consideration of and weight assigned to the opinion, stating:

> The undersigned gives little weight to the opinion of Dr. Remeneni, the claimant's treating family physician, who opined that the claimant is limited to an extreme, less than sedentary range of work activity (Exhibit 2F). Dr. Rameneni's opinion is inconsistent with his own physical examination findings, which were generally normal (Exhibit 10F, pages 18, 25, 32). Dr. Rameneni's opinion is also inconsistent with Dr. Abdelabaki's treatment notes and physical examination findings, which consistently demonstrate that the claimant is stable from a cardiovascular standpoint (Exhibit 7F & 9F). Dr. Rameneni's opinion is inconsistent with the claimant's medical non-compliance as the claimant continues to smoke and disregard diet recommendations (Exhibit 10F, page 18). Lastly, Dr. Rameneni's opinion is inconsistent with the claimant's activities of daily living, which include light housecleaning, making small repairs, walking for exercise, and socializing with family and friends (Exhibit 3F, page 5 & 10F, pages 32, 38).

Tr. 22.

Revolt challenges the ALJ's weighing of Dr. Rameneni's opinion and contends that the reasons provided are not good reasons. Revolt cites to his history of CAD as a basis upon which the ALJ should have found Dr. Rameneni's opinion consistent with, rather than inconsistent with, the record. Revolt also contends that Dr. Abdelbaki's cardiac treatment notes support a finding that Revolt's CAD was very severe and Dr. Abdelbaki's treatment notes are consistent with those of Dr. Rameneni. He also contends that the ALJ improperly relied upon treatment notes indicating that Revolt's CAD was stable because the term "stable" is a relative term.

The Court finds Revolt's challenge to the ALJ's weighing of his treating physician's opinion without merit. Here, the ALJ fully considered the evidence of record, including Revolt's "substantial history of coronary artery disease with bypass and grafting[.]" Tr. 20-21. Taking into account the evidence regarding Revolt's cardiac condition, the ALJ concluded that Revolt's impairments were not as disabling as Revolt contended and that Dr. Rameneni's opinions as to extreme limitations were not consistent with the record. Tr. 20, 22. Rather, the ALJ concluded that the record was consistent with the ability to perform light work activity. Tr. 20. Furthermore, the ALJ found that Dr. Rameneni's extreme limitations were inconsistent with Revolt's activities of daily living, which included light housecleaning, small repairs, and meal preparation. Tr. 21, 22. Revolt argues that the ALJ's reliance on his activities of daily living as a reason to discount his treating physician's opinion was misplaced because the ALJ did not explain how the cited activities of daily living were inconsistent with Dr. Rameneni's opinion and did not take into account that Revolt performed the cited activities on his own time and at his own pace. The ALJ did not find Revolt not disabled based solely on his activities of daily living. Further, Revolt's activities of daily living were not the only reason that the ALJ found Dr. Rameneni's extreme limitations not consistent with the record evidence. As indicated above, the

ALJ also found the extreme limitations inconsistent with Dr. Rameneni's own generally normal physical examination findings and inconsistent with Revolt's medical non-compliance, including his continued smoking against medical advice. Tr. 21, 22, Tr. 595 (Dr. Rameneni's 6/11/2013 treatment notes reflecting no chest pain, dyspnea or leg swelling; normal rate, regular rhythm and normal heart sounds and normal pulmonary/chest effort and no wheezes); Tr. 588 (Dr. Rameneni's 4/23/2014 treatment notes reflecting no recent chest pain, normal rate, regular rhythm, and normal heart sounds, normal pulmonary/chest effort and no wheezes, no edema); Tr. 581 (Dr. Rameneni's 1/29/2015, treatment notes reflecting normal rate, regular rhythm and normal heart sounds, normal pulmonary/chest effort and no wheezes, no edema). Revolt has not shown error with respect to these ALJ's determinations.

While Revolt disagrees with the ALJ's consideration and weighing of the evidence regarding his cardiac condition and daily activities, it is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner*, 745 F.2d at 387. Furthermore, although Revolt contends that there is evidence to support his position, even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. Revolt has not shown that the ALJ's reasons for assigning little weight to Dr. Rameneni's extreme limitations are not supported by substantial evidence. Nor has Revolt demonstrated that the ALJ's reasons are not adequately explained. Accordingly, the Court finds that reversal and remand is not warranted based on the ALJ's consideration of Dr. Rameneni's opinion.

**C.     Plaintiff is not entitled to reversal and remand based on the Appeals Council's review**

Revolt argues that reversal and remand is warranted because the Appeals Council did not consider one of two evaluation reports prepared by consultative examining psychologist Dr. Wuebker, specifically Dr. Wuebker's July 23, 2012, evaluation report. Doc. 13, pp. 9-11, Doc. 13-1, Doc. 13-2.

Revolt contends that Dr. Wuebker's 2012 evaluation report was submitted to and received by the Social Security Administration but not made part of the medical record before the ALJ decision and not considered by the Appeals Council. Doc. 13, p. 10. There is no indication that Revolt brought this issue to the attention of the Appeals Council when seeking review of the ALJ's decision. Additionally, while not labeled as a request for a sentence six remand, to the extent that Revolt is seeking a sentence six remand, Revolt has not shown that the evidence is new or material to his current claim. The 2012 evaluation report pre-dates the alleged disability onset date. The Sixth Circuit has repeatedly held that where, as here, the Appeals Council denies review and the ALJ's decision becomes the Commissioner's decision, the court's review is limited to the evidence presented to the ALJ. *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001); *Cline v. Commissioner,* 96 F.3d 146,148 (6th Cir. 1996); *Cotton v. Sullivan,* 2 F.3d 692, 696 (6th Cir. 1993); *Casey v. Secretary of Health & Human Servs.,* 987 F.2d 1230, 1233 (6th Cir. 1993); see also *Osburn v. Apfel,* No. 98-1784, 1999 WL 503528, at *4 (6th Cir. July 9, 1999) ("Since we may only review the evidence that was available to the ALJ to determine whether substantial evidence supported [his] decision, we cannot consider evidence newly submitted on appeal after a hearing before the ALJ."). The statute permits only two types of remand: a sentence four remand made in connection with a judgment affirming, modifying, or

reversing the commissioner's decision; and a sentence six remand where the court makes no substantive ruling as to the correctness of the Commissioner's decision. *See, e.g., Hollon v. Commissioner*, 447 F.3d 477, 486 (6th Cir. 2006). The court cannot consider evidence that was not submitted to the ALJ in the sentence four context; it can consider such evidence only in determining whether a sentence six remand is appropriate. *See Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007); *Foster*, 279 F.3d at 357.

The plaintiff has the burden under sentence six of 42 U.S.C. §405(g) to demonstrate that the evidence he now presents in support of a remand is "new" and "material," and that there was "good cause" for her failure to present this evidence in the prior proceedings. *See Hollon*, 447 F.3d at 483; *see also Ferguson v. Commissioner*, 628 F.3d 269, 276 (6th Cir. 2010) (although the material that the claimant sought to introduce was "new," the claimant failed to meet her burden of showing "good cause" for failure to submit materials and that the evidence was "material."). Evidence is "*new* only if it was not in existence or available to the claimant at the time of the administrative proceeding." *Ferguson*, 628 F.3d at 276 (internal quotations and citations omitted and emphasis supplied). "[E]vidence is *material* only if there is a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Id.* (internal quotations and citations omitted and emphasis supplied). "A claimant shows *good cause* by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Id.* (internal quotations and citations omitted and emphasis supplied). Revolt has not met his burden of demonstrating a basis for remanding this case pursuant to sentence six.

Furthermore, as Revolt acknowledges (Doc. 13, p. 11), the record demonstrates that both Dr. Wuebker and the state agency reviewing psychologists were aware of the existence of the

prior report when rendering their opinions relative to Revolt's current claim (Tr. 81-82, 85-86, 108, 111, 252). The ALJ considered and weighed the state agency reviewing psychologists' opinions as well as Dr. Wuebker's 2014 opinion, both of which took into account the earlier 2012 evaluation conducted by Dr. Wuebker. Thus, any claim that the 2012 evaluation was not part of the record when the ALJ or the Appeals Council rendered their decisions is unsupported by the record.

Based on the foregoing, the Court finds no reason to reverse and remand the Commissioner's decision for consideration of Dr. Wuebker's 2012 evaluation by either the ALJ or the Appeals Council.

## D. Reversal and remand is not warranted based on the ALJ's review of the mental health evidence of record

Revolt argues that the ALJ failed to properly evaluate evidence regarding his mental health when reaching the conclusion that his depression was a non-severe impairment. Doc. 13, pp. 11-13. In making his argument, Revolt acknowledges that the ALJ relied upon the opinions of the reviewing psychologists and on the 2014 opinion of Dr. Wuebker but contends that the ALJ failed to consider Dr. Wuebker's 2012 evaluation. Revolt contends that the 2012 evaluation supports a finding of a severe mental health impairment. Revolt's challenge amounts to a request for a sentence six remand. However, as discussed above, Revolt has not demonstrated a basis upon which a sentence six remand is warranted. Dr. Wuebker's July 23, 2012, evaluation pre-dated Revolt's alleged onset date, i.e., September 1, 2012. Tr. 15. Thus, Revolt cannot demonstrate that the evidence is new or that it is material.

Moreover, as acknowledged by Revolt, the state agency reviewing psychologists considered the prior report when rendering their opinions and the ALJ considered and assigned great weigh to their opinions, stating:

> The state agency psychological consultants opined that the claimant's mental impairment is non-severe, which is well supported by the mental status findings, the opinion of the independent consultative examiner, the claimant's lack of mental health treatment and the claimant's activities of daily living (Exhibits 3F & 10F).

Tr. 22.

Further, when Dr. Wuebker evaluated Revolt in July 2014, he was fully aware of his prior 2012 evaluation (Tr. 252) and the ALJ considered and weighed Dr. Wuebker's 2014 evaluation, which pertained to the period of disability under review (Tr. 22). The ALJ provided great weight to Dr. Wuebker's 2014 evaluation. Tr. 22. Revolt has not shown that the ALJ's finding that his depression was a non-severe impairment is not supported by Dr. Wuebker's opinion or the opinions of the state agency reviewing psychologists.

Based on the foregoing, the Court concludes that a sentence six remand is not warranted for consideration of Dr. Wuebker's 2012 evaluation which pre-dates the period of disability at issue nor is a sentence four remand warranted for further consideration of the mental health evidence of record pertaining to the alleged period of disability at issue.

## VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

Dated: October 16, 2018

_/s/ Kathleen B. Burke_
Kathleen B. Burke
United States Magistrate Judge